**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 92-8157**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**DONNA FRYDENLUND,**
**PERRY PRESSLEY and MAURY PAGE KEMP,**

**Defendants-Appellants.**
_____

Appeals from the United States District Court
for the Western District of Texas
_____

(May 4, 1993)

Before POLITZ, Chief Judge, GOLDBERG, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Appellants Maury Kemp, Perry Pressley, and Donna Frydenlund were convicted of bank fraud, in violation of 18 U.S.C. § 1344(1), and of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 371. All three were sentenced to terms of imprisonment and were ordered to pay restitution of approximately $1.5 million. Kemp and Pressley challenge their sentences. Pressley and Frydenlund challenge their convictions. Finding no reversible error, we affirm.

## I.

In late 1989, Kemp owned three car dealerships in California. Frydenlund served as comptroller and general manager of those businesses. Pressley, based in El Paso, was the comptroller for Kemp Group, a holding company for Kemp's business

entities, including the three California car dealerships. Pressley was Kemp Group's only employee and prepared financial statements, signed checks, and ran errands for Kemp.

Kemp Group had a checking account at MBank in El Paso. The three California dealerships had accounts at First Interstate Bank in California. As the businesses began to fail in late 1989 and 1990, Kemp devised a check-kiting scheme to keep them running until he could sell them as ongoing businesses. He instructed Pressley to send blank Kemp Group checks to California, which would then be filled out by Frydenlund in the amount needed to keep the businesses' accounts current. In return, Frydenlund would send back checks drawn on the First Interstate accounts to Pressley in El Paso to cover the amounts of the Kemp Group checks. Pressley would then deposit these checks in the MBank account. Over the next few months, hundreds of checks traveled back and forth in this manner between Kemp Group and the California dealerships.

In January 1991 First Interstate uncovered the scheme and informed MBank that it was returning 37 checks totalling more than $1.5 million. MBank posted the checks as overdrafts. A jury convicted the three defendants of bank fraud and of conspiracy to commit bank fraud. The trial judge gave them prison sentences and ordered them to pay restitution of approximately $1.5 million.

**II.**

Appellants Pressley and Frydenlund challenge the sufficiency of the evidence to convict them. In such challenges, the court must decide whether a rational jury could find evidence

2

that establishes guilt beyond a reasonable doubt. <u>United States v. Espinoza-Seanez</u>, 862 F.2d 526, 536 (5th Cir. 1988). Not every reasonable hypothesis of innocence need be excluded by the evidence. <u>Id</u>. And all reasonable inferences and credibility choices must be viewed in the light most favorable to the government. <u>Id</u>.

The jury in this case could reasonably conclude from the evidence presented at trial that both Pressley and Frydenlund knowingly participated in a scheme to defraud MBank and FIB. Both Pressley and Frydenlund admit full knowledge of the scheme. They also admit that they acted under Kemp's orders to carry the scheme forward. They argue in defense only that they lacked the specific intent to deceive or cheat the bank. These arguments are unpersuasive.

Check kiting is a scheme "designed to separate the bank from its money by tricking it into inflating bank balances and honoring checks drawn against accounts with insufficient funds." <u>United States v. Doherty</u>, 969 F.2d 425, 428 (7th Cir.), <u>cert. denied</u>, ____ U.S. ____, 113 S. Ct. 607, 121 L.Ed.2d 542 (1992); <u>see</u> <u>Williams v. United States</u>, 458 U.S. 279, 281 n.1, 102 S. Ct. 3088, 3089 n.1, 73 L.Ed.2d 767 (1982). Section 1344(1) does not require a specific intent to permanently deprive the bank of its funds. It is sufficient to knowingly participate in a scheme to trick the bank into inflating bank balances by kiting checks between two or more banks. The bare act of check kiting defrauds the bank by

temporarily placing the bank's funds at the disposal of the account holder.[1]

Notwithstanding Pressley's and Frydenlund's declared intent that the banks not be permanently deprived of funds, these convictions must be sustained. Both admitted full knowledge of the check-kiting scheme. They knew they were participating in check kiting, and they knew that their activities would have the effect of artificially inflating the balances of Kemp's accounts in MBank and FIB. In extenuation, these appellants point out that they were following Kemp's orders. Because he was a wealthy, established businessman who had recently injected $500,000 additional capital into the California dealerships, they had every reason to believe he did not plan to deprive the banks of their money or to inflict losses on them. Kemp, to his credit, accepted full personal responsibility for the scheme and testified in his employees' behalf. There is pathos in Kemp's and the appellants' positions, but it cannot overcome the jury verdict finding them guilty under § 1344(1).

There was also ample evidence that the defendants took part in a conspiracy to keep the check kite operating for months. The defendants acted in concert with Kemp to facilitate the

---

1. At least six Circuits have expressly held that bare check-kiting schemes fall within the scope of section 1344(1). See Doherty, 969 F.2d at 428-29; United States v. Stone, 954 F.2d 1187, 1189-91 (6th Cir. 1992); United States v. Fontana, 948 F.2d 796, 802 (1st Cir. 1991); United States v. Celesia, 945 F.2d 756, 758-59 (4th Cir. 1991); United States v. Schwartz, 899 F.2d 243, 246-47 (3d Cir.), cert. denied, 498 U.S. 901, 111 S. Ct. 259, 112 L.Ed.2d 217 (1990); United States v. Bonnett, 877 F.2d 1450, 1454-56 (10th Cir. 1989).

exchange of hundreds of checks. To find a conspiracy violation under 18 U.S.C. § 371, a jury need only find an agreement between two or more persons to violate the law and an overt act by one member of the conspiracy in furtherance of the conspiracy. A specific agreement need not be shown, but may be inferred from concert of action. See United States v. Magee, 821 F.2d 234, 239 (5th Cir. 1987). Here, there was clearly a concert of action between Kemp, on the one hand, and his financial managers, on the other.

## III.

Appellants Kemp and Pressley argue that the district court erred in calculating their base offense level under the sentencing guidelines. Persons convicted of check kiting are sentenced under section 2F1.1 of the Guidelines. See Doherty, 969 F.2d at 430; United States v. Haddock, 956 F.2d 1534; 1554 (10th Cir.), cert. denied, _____ U.S. _____, 113 S. Ct. 88, 121 L.Ed.2d 50 (1992); United States v. Carey, 895 F.2d 318, 323 (7th Cir. 1990); United States v. Bolden, 889 F.2d 1336, 1339 (4th Cir. 1989). The ultimate overdraft in this case was $1,552,430.99, and the district court used that amount for the purpose of calculating the appropriate upward adjustment under section 2F1.1(b)(1).

The appellants argue that it was inappropriate to use the total amount of the overdraft, because after the dust settled MBank's loss was much less than the amount of the overdraft. The defendants believe that the real loss to MBank is zero, because Kemp executed a promissory note to MBank for the full amount of the

overdraft, secured by a second lien on the California dealership properties, and because Kemp will eventually pay back MBank when he sells the dealerships. According to the appellants, because MBank's losses, if any, will be lower than the amount of the overdraft at the time the scheme was uncovered, the court erred by sentencing them according to the higher, "inflated" number.

Appellants characterize their argument as directed not at the district court's finding of MBank's actual loss, which is shielded by the clearly erroneous rule on appeal,[2] but at its legal misapplication of the guidelines, a matter we review de novo.[3] The appellants contend that check kiting should be treated like a fraudulently obtained loan, for which an application note accompanying § 2F1.1 specifies that the victim's (i.e., the bank's) loss "is the amount of the loan not repaid at the time the offense is discovered," reduced by whatever the bank might recover from collateral pledged to secure the loan. U.S.S.G. § 2F1.1 appl. note 7(b).

We reject this argument for two reasons. First, check kiting is not more equivalent to a fraudulent loan transaction than to simple theft. As the government points out, the bank at least voiced its approval of the credit extended on a fraudulently obtained loan, while a check kite is done surreptitiously precisely because the bank would under no circumstances have lent to the

_____

2. United States v. Rodriquez, 897 F.2d 1324, 1325 (5th Cir.), cert. denied, 498 U.S. 857, 111 S. Ct. 158, 112 L.Ed.2d 124 (1990).

3. United States v. Ruff, 984 F.2d 635, 639 (5th Cir. 1993).

6

kiter.  The bank also voluntarily places a limit on its risk when it lends money, but it is at the mercy of the check kiter for the amount of loss he may cause.

Second, no matter which part of § 2F1.1 is applied, the sentencing standard depends upon the bank's actual loss.  Kemp did not disagree that the out-of-pocket loss to MBank was $1.5 million: he agreed to repay that amount.  The only question here is whether his agreement, his good intentions, and the second lien on the California dealerships reduced that actual loss.[4]  The district court implicitly found they did not, and this finding is not clearly erroneous.  At the time of sentencing, Kemp's financial empire was in trouble, the appraisals of the dealerships could be seen as optimistic, the sales proceeds for one were tied up in litigation, and no payments had been made to reduce the $1.5 million loss.  Without hearing further explanation, the court was not required to credit the bank's lower estimate of its loss to a third party.  Thus, although it is possible that the actual loss may in some cases be less than the overdraft when the kite is discovered, Kemp did not persuade the court of that in his case.

The Seventh Circuit has rejected a similar argument in United States v. Carey, 895 F.2d 318 (7th Cir. 1990).  In Carey, the defendant's check-kiting scheme left a $220,000 deficit in his

---

4.   The fraudulent loan cases cited by Kemp are distinguishable on the facts, because in each of those, the "actual loss" was subject to reduction by actual payments made on the loans before default and valuable collateral given for those loans.  See United States v. Kopp, 951 F.2d 521 (3d Cir. 1991); United States v. Rothberg, 954 F.2d 217 (4th Cir. 1992); Haddock, 956 F.2d at 1554-55.

account when the scheme was finally exposed. The district court granted Carey a downward departure because he had restored all but $20,000 of the money owed to the bank. The Seventh Circuit reversed, holding that restitution did not alleviate the fact that he had defrauded the bank of $220,000 before his artifice was discovered. The entire loss was due directly to Carey's actions, and his restitution of the lion's share of the money, though commendable, did not decrease the seriousness of the crime he had committed. The district court in this case did not erroneously apply the Guidelines to determine the appellants' sentences.[5]

**CONCLUSION**

For the foregoing reasons, the judgment and sentences of each appellant are **AFFIRMED**.

---

5. The government suggests by innuendo that the sum total of the defendants' fraud approached $47,000,000, the total of all of the checks used in the kiting scheme. That figure grossly misstates the nature of the scheme. Each check worked only a temporary float. A check-kiting scheme involving only two checks would inflate the account balances for only a very short time, perhaps only a few days. In a more involved scheme, each check replaces the previous checks, merely sustaining the float, rather than adding to the amount floated. See United States v. Deutsch, ____ F.2d ____, ____, 1993 W.L. 32685, at *7 (2d Cir. Feb. 11, 1993).