UNITED STATES of America, Plaintiff,

v.

David C. MARKER, Defendant.

No. 94–40002–01–SAC.

United States District Court,
D. Kansas.

Dec. 28, 1994.

Donald R. Hoffman, Tilton & Hoffman, Topeka, KS, for defendant David C. Marker.

Kurt J. Shernuk, Office of U.S. Atty., Kansas City, KS, Richard L. Hathaway, Office of U.S. Atty., Topeka, KS, for plaintiff U.S.

## MEMORANDUM AND ORDER

CROW, District Judge.

On January 5, 1994, the grand jury returned a twenty-two page, 21 count indictment charging David C. Marker, the defendant, with six counts of mail fraud (in violation of 18 U.S.C. § 1341), ten counts of bank fraud (in violation of 18 U.S.C. § 1344(1)), one count of embezzling, stealing, purloining or converting money of the United States (in violation of 18 U.S.C. § 641), and four counts of engaging in monetary transactions in property derived from specified unlawful activity (in violation of 18 U.S.C. § 1957(a)).

Highly summarized, these are the essential facts of this case. David C. Marker transacted business within the state of Kansas as and through Homestead Land Title Company (HLTC), Homestead Escrow Company, Homestead Land Title Company of Lawrence and Homestead Land Title Company of Junction City, Kansas. Marker, through HLTC and related companies, held himself out to the public as a title company providing services in accordance with schedules of published rates that were filed with the Kansas Insurance Department. Included in the title services were residential and commercial real estate closings in which Marker agreed to prepare closing documentation, record deeds, prepare settlement statements and hold and disburse customers' funds in accordance with their instructions.

Marker also held himself out as a provider of escrow services to the general public including the safeguarding of documents of title as part of installment contracts for deed sales agreements. For a variable monthly fee, Marker agreed to collect, and safeguard monthly payments of principal, interest, taxes and insurance made by his customers, and to make distribution of these moneys in accordance with the escrow agreement.

In June 1991, Marker apparently became aware that there were substantial shortages in the trust accounts, creating uncertainty about the continuing viability of his businesses. From July, 1991, until Marker ceased doing business as and through HLTC

and related companies in August of 1992, Marker took in approximately $34,000,000 in trust funds from customers utilizing the United States mail and other means of delivery. Rather than holding those funds in trust, Marker began using portions of those funds to satisfy general operating expenses of his businesses. Marker also used those funds to satisfy his personal expenses.

In addition to converting funds held in trust to satisfy his personal and business expenses, Marker engaged in a scheme of check kiting[1] between his various business entities in a desperate effort to stay afloat. In August of 1992, despite his conversion of funds and kiting of checks, Marker's fraudulent scheme capsized.

On August 19, 1992, the U.S. Postal Service delivered a U.S. Treasury Check for $350,000 to HLTC. The check was to be used to purchase certain real estate. Instead, Marker used those funds to pay other HLTC obligations. On August 24, 1992, the date the real estate transaction was to be consummated, HLTC was unable to close because HLTC's title insurance underwriter, First American Title Insurance Company, had cancelled its relationship with HLTC.

On August 27, 1992, the Post Office demanded return of $350,200 which it had delivered to HLTC. On August 28, 1992, HLTC filed a petition for bankruptcy under Chapter 7 of the Bankruptcy code. On September 9, 1992, pursuant to a seizure warrant issued by Judge Saffels, $272,103.46 was seized from certain HLTC accounts.

The failure of HLTC and related companies caused four hundred and eighty-seven persons or entities to lose funds they had entrusted to the care of HLTC. The amount of those losses varies substantially—the smallest claim is $30.72, while the largest claim is $350,200, the U.S. Postal Service's claim.[2] The outstanding claims total $508,-280.36.

On June 10, 1994, pursuant to a plea agreement, Marker entered a plea of guilty to Count 4 of the indictment, which charged a violation of 18 U.S.C. § 1344(1) and 2 (bank fraud by check kiting). In exchange for his plea, the government agreed, *inter alia,* to dismiss the remaining counts of the indictment. The government also agreed to recommend that Marker receive a two level reduction for acceptance of responsibility. *See* United States Sentencing Commission, ***Guidelines Manual,*** § 3E1.1. In addition, the government agreed that it would not argue that the loss for the purposes of calculating Marker's sentence would be greater than $351,000.

Following the defendant's guilty plea, a presentence report was prepared. A revised report was also prepared. The presentence report indicates that the gross loss to persons who intrusted funds to Marker to be $508,280.36. Based upon this determination, the presentence report made the following calculations for purposes of sentencing:

| | |
|---|---|
| Base Offense Level (USSG § 2F1.1) | +6 |
| Specific Offense Characteristics (USSG § 2F1.1(b)(1)(K)) | +10 |
| Planning (USSG § 2F1.1(b)(2)(A) and (B)) | +2 |
| Adjustments for Role (USSG § 3B1.3) | +2 |
| Total | 20 |
| Acceptance of Responsibility (USSG § 3E1.1) | −2 |
| Total Offense Level | 18 |

Based upon a criminal history level of I (zero criminal history points), the presentence report suggests that a Guideline Range of 27–33 months is appropriate. Prior to sentencing, Marker filed certain objections to the presentence report.

On November 22, 1994, the court conducted a portion of the sentencing hearing in this case. Based upon the complexity of the legal issues presented concerning the appropriate

---

**1.** "Check kiting is a scheme 'designed to separate the bank from its money by tricking it into inflating bank balances and honoring checks drawn against accounts with insufficient funds.'" *United States v. Frydenlund,* 990 F.2d 822, 824 (5th Cir.) (quoting *United States v. Doherty,* 969 F.2d 425, 428 (7th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 607, 121 L.Ed.2d 542 (1992)), *cert. denied,* — U.S. —, 114 S.Ct. 337, 126 L.Ed.2d 281 (1993). *See Williams v. United States,* 458 U.S. 279, 280 n. 1, 102 S.Ct. 3088, 3090 n. 1, 73 L.Ed.2d 767 (1982).

**2.** In April of 1993, the Bankruptcy Trustee dispersed $170,000 from the $272,103.46 seized to the U.S. Postal Service in partial compensation for its $350,200 loss. The remainder of the U.S. Postal Service's claim, $180,200, has not yet been satisfied.

calculation of "loss" within the meaning of § 2F1.1(b)(1), the court continued the sentencing hearing until December 28, 1994. In the interim, the court permitted the parties to file memoranda in support of their respective positions. Marker did not avail himself of the opportunity to file a reply brief to the government's response to his opening brief.

Marker does not dispute the "gross loss" calculation and in fact concedes that amount, $508,280.36, to be accurate. However, Marker contends that he should not be saddled with the entire $508,280.36 under § 2F1.1. Instead, Marker contends that he should receive credit for amounts that the persons claiming losses will likely receive as disbursements from the bankruptcy estate of HLTC. In other words, Marker contends that for purposes of calculating the specific offense characteristics pursuant to § 2F1.1(b)(1), the court should only consider the *anticipated net loss* to those persons and entities who lost funds due to his fraudulent scheme. Marker suggests that the loss should be no more than $75,000.[3]

In addition, Marker contends that he should receive an additional reduction of one point under USSG § 3E1.1(b).

The government does not oppose Marker's suggestion that the loss should be reduced to less than $500,000, but contends that it is inappropriate for the court to give the defendant credit for the full amount which may ultimately be repaid through bankruptcy. The government contends that the defendant should, at most, be given credit for the cash which was seized from HLTC's accounts on September 9, 1992 (less the amount already dispersed to the U.S. Postal Service), or $102,103.46. The government also opposes Marker's request for an additional one point reduction under § 3E1.1(b).

The court, having considered the arguments and briefs of counsel, the applicable law, the evidence presented, and the presentence report, makes the following preliminary findings.

---

**3.** Marker does not articulate the manner in which he has arrived at the $75,000 figure, nor is it readily apparent to the court how the defendant has arrived at that number. Suffice it to say the defendant apparently contends that the

## § 2F1.1: Specific Offense Characteristics

Under the sentencing guidelines, the district court is empowered to make a reasonable estimate of loss attributable to fraud, based on all available information. *United States v. McAlpine*, 32 F.3d 484, 488 (10th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 610, —— L.Ed.2d —— (1994). "Sections 2F1.1 and 2B1.1 of the guidelines and accompanying Commentary are designed to gauge the severity of a particular offense." *United States v. Reddeck*, 22 F.3d 1504, 1511–1512 (10th Cir.1994). "The Guidelines increase a defendant's base offense level sentence for either actual or intended loss, whichever is greater." *United States v. Smith*, 951 F.2d 1164, 1166 (10th Cir.1991).

In pertinent part, the sentencing guidelines provide:

(a) Base Offense Level: 6

(b) Specific Offense Characteristics

(1) If the loss exceeded $2,000, increase the offense level as follows:

| Loss (Apply the Greatest) | | (Increase in Level) |
|---|---|---|
| (A) | $2,000 or less | no increase |
| (B) | More than $2,000 | add 1 |
| (C) | More than $5,000 | add 2 |
| (D) | More than $10,000 | add 3 |
| (E) | More than $20,000 | add 4 |
| (F) | More than $40,000 | add 5 |
| (G) | More than $70,000 | add 6 |
| (H) | More than $120,000 | add 7 |
| (I) | More than $200,000 | add 8 |
| (J) | More than $350,000 | add 9 |
| (K) | More than $500,000 | add 10 |

· · · ·

*Commentary*

· · ·

*Application Notes:*

· · · · ·

7. *Valuation of loss is discussed in the Commentary to § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft). As in theft cases, loss is the value of the money, property, or services unlawfully taken; it does not, for example, include interest the victim could have earned on*

bankruptcy estate, after paying all of its administrative fees, will have sufficient funds to pay a substantial portion (approximately 85%) of the outstanding claims.

such funds had the offense not occurred. Consistent with the provisions of § 2X1.1 (Attempt, Solicitation or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss. Frequently, loss in a fraud case will be the same as in a theft case. For example, if the fraud consisted of selling of attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the "loss" would be treated as $40,000.

There are, however, instances where additional factors were to be considered in determining the loss or intended loss:

(a) *Fraud Involving Misrepresentation of the Value of an Item or Product Substitution.*

A fraud may involve the misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless). Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock was overvalued (i.e., $30,000). In a case involving a misrepresentation concerning the quality of a consumer product, the loss is the difference between the amount paid by the victim for the product and the amount for which the victim could resell the product received.

(b) *Fraudulent Loan Application and Contract Procurement Cases.*

In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used.

In some cases, the loss determined above may significantly understate or overstate the seriousness of the defendant's conduct. For example, where the defendant substantially understated his debts to obtain a loan, which he nevertheless repaid, the loss determined above (zero loss) will tend not to reflect adequately the risk of loss created by the defendant's conduct. Conversely, a defendant may understate his debts to a limited degree to obtain a loan (e.g., to expand a grain export business), which he genuinely expected to repay and for which he would have qualified at a higher interest rate had he made truthful disclosure, but he is unable to repay the loan because of some unforeseen event (e.g., an embargo imposed on grain exports) which would have caused a default in any event. In such a case the loss determined above may overstate the seriousness of the defendant's conduct. Where the loss determined above significantly understates or overstates the seriousness of the defendant's conduct, an upward or downward departure may be warranted.

. . . . .

8. For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations. The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss.

"[T]he government has the burden to prove the amount of loss by a preponderance of the evidence." *McAlpine*, 32 F.3d at 487; see *Reddeck*, 22 F.3d at 1512.

The defendant argues, and the government concedes, that under certain circumstances the courts, including the Tenth Circuit, have used a "net loss" approach for determining the appropriate increase in offense level un-

der § 2F1.1(b)(1). *See, e.g., McAlpine,* 32 F.3d at 486–488; *Reddeck,* 22 F.3d at 1512–1513; *United States v. Haddock,* 12 F.3d 950, 961 (10th Cir.1993); *United States v. Gallegos,* 975 F.2d 710, 712–713 (10th Cir.1992); *Smith,* 951 F.2d at 1167 ("Under the circumstances of this case, we conclude that actual loss should be measured by the net value, not the gross value, of what was taken."). However, this general rule is tempered by the application notes and case law interpreting the guidelines regarding the appropriate calculation of loss under § 2F1.1 in a case where the defendant is convicted of check kiting.

The issue in this case, where the defendant has been convicted of check kiting, is whether net loss is calculated as it exists at the time the offense is detected or at the time of sentencing. In this case, the impact on the defendant's total offense level is significant. The Tenth Circuit does not appear to have directly spoken on this issue. The Third, Fifth and Sixth Circuits have taken the position that the defendant is only entitled to offset the actual loss by the amount on deposit at the time of apprehension. *See United States v. Shaffer,* 35 F.3d 110 (3rd Cir. 1994) ("We believe that check kiting crimes, because of their particular nature, are crimes where the district court must calculate the victim's actual loss as it exists at the time the offense is detected rather than as it exists at the time of sentencing."); *United States v. Carman,* No. 93–6184, 1994 WL 236493, 1994 U.S.App. LEXIS 13245 (6th Cir. June 1, 1994) (defendant may offset actual loss by amount on deposit at time of apprehension, but restitution made after apprehension cannot properly offset actual loss from a check-kiting scheme); *United States v. Frydenlund,* 990 F.2d 822 (5th Cir.) (for purposes of § 2F1.1, district court not required to reduce actual loss for amounts defendant might repay "after the dust settled."), *cert. denied,* —— U.S. ——, 114 S.Ct. 337, 126 L.Ed.2d 281 (1993).

In *Shaffer,* the Third Circuit explained the rational for this construction of the guidelines:

First, the commentary to U.S.S.G. § 2F1.1 indicates that loss valuation should be made in accordance with the valuation of theft loss pursuant to the commentary to U.S.S.G. § 2B1.1. U.S.S.G. § 2F1.1 comment. (n. 7). "As in theft cases, loss is the value of the money, property, or services unlawfully taken." *Id.* In a check kiting scheme, where the offender writes bad checks to "temporarily ... obtain credit," Black's Law Dictionary 238 (6th ed. 1990), the amount of money owed to the victim banks at the time the kite is detected is the value of the money unlawfully taken by the defendant. In effect, the gross amount of the kite at the time of detection, less any other collected funds the defendant has on deposit with the bank at that time and any other offsets that the bank can immediately apply against the overdraft (including immediate repayments), is the loss to the victim bank.

Second, we do not believe that most check kiting frauds are sufficiently analogous to secured loan frauds to require, as we held in *[United States v.] Kopp,* [951 F.2d 521 (3rd Cir.1991)] that the actual loss determination be made as the loss exists at the time of sentencing rather than at the time of detection. Although both of these types of bank fraud involve fraudulently obtained loans, the similarities end there. Secured loan frauds include an aspect that is ordinarily entirely absent from a check kiting scheme—namely collateral, which while probably insufficient to protect the victim bank completely against risk of loss, usually provides some recovery against the loan amount. By its very nature, the crime of kiting checks ordinarily involves the borrowing of funds without authorization from the bank and without the offender providing any security to protect the bank against risk of loss. This distinction warrants treating perpetrators of check kiting loan frauds in most cases differently from perpetrators of secured loan frauds for sentencing purposes.

Furthermore, we do not believe that calculating check kiting fraud loss at the time of detection is contrary to the commentary contained in the Sentencing Guidelines. The Sentencing Guidelines have been clarified to make explicit the rule we announced in *Kopp* as applicable to secured

loan frauds, but not unsecured loan frauds like check kiting. The Guidelines commentary now states in relevant part:

> In fraudulent loan application cases . . ., the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan.

U.S.S.G. § 2F1.1 comment. (n. 7(b)). The Sentencing Guidelines apparently limit this wait-and-see approach to calculating actual loss to secured loans because with unsecured loans, like those which sometimes result when check kiting schemes are detected, any recovery is entirely speculative. Nevertheless, to the extent the Guidelines commentary indicates that in secured loan frauds the actual loss should be reduced by the amount of money immediately repaid by the offender at the time of discovery, the same is true of check kiting frauds.

Moreover, the weight of authority, while sparse, supports our conclusion that for purposes of sentencing a defendant who has perpetrated a bank fraud by kiting checks, actual loss should be calculated as it exists at the time of detection rather than at the time of sentencing. Likening check kiting frauds more to simple theft than secured loan transactions, the Court of Appeals for the Fifth Circuit adopted the position we adhere to today. *United States v. Frydenlund,* 990 F.2d 822, 825–26 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 192, 126 L.Ed.2d 150 (1993). Other courts of appeals have held that the fortuity of the defendant paying full restitution to the victim banks after the time when the check kiting fraud was detected does not warrant a downward departure on the sentence for acceptance of responsibility. *United States v. Carey,* 895 F.2d 318, 322–23 (7th Cir.1990); *United States v. Bolden,* 889 F.2d 1336, 1340–41 (4th Cir.1989).

Finally, we, like the district court, are troubled by the outcome which would result if actual loss is calculated as it exists at the time of sentencing rather than at the time of detection. We agree with the sentiment, stated by the district court at sentencing, that a reduction of sentence because of a last minute payment of restitution would unfairly discriminate in favor of those with greater financial resources. We are also concerned that permitting such a reduction in sentence might encourage the use of undue pressure by a defendant to induce the victim bank into settling for payment of only a portion of the amount it has lost. In sum, it is a hallmark of our sentencing scheme that criminal defendants who have committed identical crimes, and who have the exact same culpability, should be treated equally at sentencing pursuant to U.S.S.G. § 2F1.1(b) even though one has the means through business or personal relations to make restitution to the victim banks after he has been convicted, while the other does not.

35 F.3d at 114–115 (footnotes omitted).

Based upon its understanding of the guidelines and applicable commentary, this court concludes that it is appropriate to calculate the victims' loss as it exists at the time the offense is detected rather than as it exists at the time of sentencing. The weight of authority clearly supports this conclusion. Moreover, the court believes that this calculation more accurately reflects the seriousness of the defendant's crime and the impact of his fraudulent scheme on the victims who suffered as a result of that scheme.

The court therefore finds that the loss for purposes of § 2F1.1 to be greater than $350,000, but less than $500,000 ($508,280.36 − $102,103.46 = $406,176.90). Pursuant to § 2F1.1(b)(1)(J), Marker's offense level is increased 9 points.

### Acceptance of Responsibility

 USSG § 3E1.1, *Acceptance of Responsibility,* provides:

(a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.

(b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and the defendant has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps:

(1) timely providing complete information to the government concerning his own involvement in the offense; or

(2) timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently, decrease by 1 additional level.

Marker, as the defendant, bears the burden of proving by a preponderance of the evidence that he is entitled to a sentence reduction for acceptance of responsibility. *See United States v. Francis,* 39 F.3d 803 (7th Cir.1994) ("The defendant bears the burden of proving by a preponderance of the evidence that he is entitled to the reduction under § 3E1.1(b)."); *McAlpine,* 32 F.3d at 489; *United States v. Tovar,* 27 F.3d 497 (10th Cir.1994).

In this case, the only issue disputed by the parties is whether Marker announced his decision to enter a guilty plea at a point in time early enough to permit the government to avoid preparing for trial. The government contends that by the time Marker notified it that he intended to enter a guilty plea, it had already committed considerable resources to preparing for trial. Marker contends that he announced his intention to enter a guilty plea as early as was practicable in light of the voluminous discovery and the manner in which this case was set and reset for trial by the court.

The court concludes that Marker has demonstrated by a preponderance of the evidence that he is entitled to an additional one point decrease of the offense level pursuant to § 3E1.1(b). Under the unique circumstances of this case, the court is persuaded that the defendant timely notified authorities of his intention to enter a guilty plea. As the defendant suggests, changes in the court's calendar constricted the amount of time in which he could give further advance notice of his intention to enter a guilty plea. Under **these** circumstances, the court is persuaded that an additional one point reduction is warranted.

### Restitution

The court simply notes that its calculation of special offense characteristics under § 2F1.1(b)(1) in no way affects the amount of restitution the defendant will be required to pay. Given the number and disparate size of restitution claims, the court has devised a manner of administering the defendant's payment of restitution which will credit the defendant for any amounts distributed in bankruptcy, but at the same time will permit the probation department to administer the distribution of the defendant's payments (in the event that the bankruptcy estate does not have sufficient assets to pay all claimants) to all claimants in a reasonable and efficient manner.

IT IS SO ORDERED.