**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**William D. FLOWERS, Sr., a/k/a Bill Flowers (94–5807) and William D. Flowers, Jr., a/k/a Dallas Flowers (94–5806), Defendants–Appellants.**

Nos. 94–5806, 94–5807.

United States Court of Appeals,
Sixth Circuit.

Argued March 24, 1995.

Decided May 26, 1995.

Carroll L. Andre, III, Asst. U.S. Atty. (argued & briefed), Memphis, TN, for plaintiff-appellee U.S.

Michael J. Stengel (argued & briefed), Memphis, TN, for defendant-appellant William D. Flowers, Jr. aka Dallas Flowers.

April R. Ferguson (argued & briefed), Federal Public Defender's Office, Memphis, TN, for defendant-appellant William D. Flowers, Sr. aka Bill Flowers.

Before: JONES and BATCHELDER, Circuit Judges; JOINER, District Judge.*

BATCHELDER, Circuit Judge.

Defendants William D. Flowers, Sr. ("Bill Flowers") and William D. Flowers, Jr. ("Dallas Flowers") appeal their sentences following pleas of guilty to conspiracy and substantive violations of the federal bank fraud statute, 18 U.S.C. § 1344. The district court sentenced both defendants to twenty-four months of imprisonment. We affirm.

## I.

To finance operation of their service stations, the defendants executed a check-kiting scheme between their accounts at First State Bank ("FSB") in Parkin, Arkansas and Shelby Bank ("Shelby") in Bartlett, Tennessee.[1]

---

* The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation.

1. By depositing in one account checks drawn on other insufficiently funded accounts, the offender in a check-kiting scheme tricks two or more banks into inflating account balances and honoring bad checks. In effect, the offender writes himself a series of unauthorized, unsecured, and interest-free "loans," which may or may not be repaid. His actions put the banks at risk for the amount of the insufficient funds and deprive the banks of their assets by placing the unauthorized funds at the disposal of the check kiter.

The kite collapsed in February 1990, when FSB discovered the scheme and returned to Shelby dishonored checks totalling approximately $1.1 million. The defendants were already indebted to Shelby on a fully-drawn line of credit in the amount of $400,000, but they executed a promissory note for the $1.1 million attributable to the returned checks, agreeing to repay Shelby within ninety days. Shelby exercised its statutory right to offset against this shortage approximately $84,000 in another account the defendants maintained at the bank. By presenting Shelby with funds they had on deposit in other banks, the defendants reduced Shelby's loss to approximately $728,000 by the end of May 1991. In February 1992, the defendants sold their business operations and applied all proceeds of the sale to their obligations at Shelby. On February 18, 1993, the defendants were indicted on nineteen counts of violating the federal bank fraud statute, which prohibits schemes or artifices to obtain funds from a financial institution by means of false or fraudulent pretenses. 18 U.S.C.A. § 1344 (West Supp.1995). Pursuant to plea agreements, each defendant pleaded guilty on January 3, 1994, to one count of conspiracy and one count of bank fraud by check kiting.

The defendants' presentence reports included an eleven-level enhancement pursuant to the United States Sentencing Commission *Guidelines Manual* (U.S.S.G. or "the Guidelines") because the amount of the loss to Shelby was more than $800,000 but less than $1.5 million. U.S.S.G. § 2F1.1(b)(1) (Nov. 1989). Following the sentencing hearing on May 24, 1994, the district court adopted the presentence reports and sentenced both defendants to twenty-four months of imprisonment.[2] Both defendants argue that the district court erred in assessing a loss of $1.1 million. Bill Flowers argues that the district court erred in failing to recognize that it had the authority to depart downward from the range specified by the Guidelines because of his extraordinary efforts to make complete restitution to the bank. Dallas Flowers contends that the district judge improperly concluded that the Guidelines did not permit a downward departure in a case such as this in which the loss overstated the seriousness of the offense. The Government maintains that the Guidelines calculation was correct and that there was no basis for a downward departure. Thus, this appeal raises the following issues: (1) what is the relevant point in time for determining the bank's loss in a check-kiting scheme; (2) whether, for purposes of U.S.S.G. § 2F1.1, a bank suffers a loss when the offender in a check-kiting scheme makes full restitution after detection; and (3) whether in this case there was any basis for a downward departure.

## II.

■ Appellate review of sentences imposed under the Guidelines is generally governed by 18 U.S.C. § 3742. *See United States v. Morrison*, 983 F.2d 730, 731–32 (6th Cir.1993). We review *de novo* the sentencing court's interpretation of the Guidelines but uphold the sentencing court's factual findings unless they are clearly erroneous. *Id.* The language of the Guidelines does not directly address the issues presented in this case. The offense of conviction in this case, bank fraud, is included under § 2F1.1 of the Guidelines. The commentary to that section states that valuation of loss in offenses of fraud and deceit is discussed in the commentary to § 2B1.1 covering other forms of theft, and that "[i]n keeping with the Commission's policy on attempts, if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss." U.S.S.G. § 2F1.1, comment. (n.7). The commentary further notes that determination of the "amount of loss need not be precise." U.S.S.G. § 2F1.1, comment. (n.8). Neither § 2B1.1 nor § 2F1.1 of the Guidelines[3] ad-

---

2. The presentence report as to each defendant reflected a total offense level of 17 and a criminal history category of I; thus, the sentencing range under the Guidelines was twenty-four to thirty months of imprisonment.

3. For purposes of this appeal, the November 1989 edition of the Guidelines, in effect at the time these defendants were sentenced, was used. It is worth noting that the relevant sections of the current edition of the Guidelines also do not address the point in time at which actual loss is to be calculated.

dresses the point in time at which actual loss is to be calculated.

■ This Circuit has not previously addressed these issues in a reported opinion. However, four of our sister circuits have decided that the relevant point in time for determining the amount of loss is at the time the crime was detected, rather than at sentencing, and that defendants convicted of bank fraud by check kiting will not be permitted to buy their way out of jail by subsequently making voluntary restitution.[4] The defendants argue that the bank suffered no loss because they were able to make complete restitution to the bank prior to their indictment. To accept that argument is to deny reality.

■ The defendants urge the Court to treat their offense the same, for purposes of sentencing, as the offense of secured loan fraud. There is no support, either in the Guidelines or in common sense, for so doing. The defendants assert that our recent decision in *United States v. Moored*, 38 F.3d 1419 (6th Cir.1994), supports their position. In *Moored*, we held that the amount of the loss in a fraudulently induced secured loan case is the actual loss to the victim or the loss that the defendant subjectively intended to inflict, whichever is greater. *Id.* at 1427. However, *Moored* is inapposite. Check kiting is substantively different from other types of bank fraud. Check kiting is more akin to theft than to fraudulently obtaining a loan. The offender in a fraudulently induced loan transaction at least asked the bank to provide the funds and gave some kind of security in return. *See United States v. Shaffer*, 35 F.3d 110, 114 (3d Cir.1994) ("Secured loan

frauds include an aspect that is ordinarily entirely absent from a check kiting scheme— namely collateral."); *see also United States v. Frydenlund*, 990 F.2d 822, 826 (5th Cir.) (rejecting argument that check-kiting scheme should be treated like a fraudulently obtained loan), *cert. denied*, —— U.S. ——, 114 S.Ct. 337, 126 L.Ed.2d 281 (1993).

■ The fact that the offender caught in a check-kiting scheme may not intend permanently to deprive the bank of the illegally obtained funds does not transform the completed check-kiting activity into a mere "attempt" for purposes of determining the amount of loss for sentencing. Not every check-kiting scheme is an "attempt" within the meaning of the Guidelines. Our decision in *United States v. Watkins*, 994 F.2d 1192 (6th Cir.1993), should not be read to require sentencing judges to analyze check-kiting schemes under § 2X1.1 of the Guidelines in those cases where the facts demonstrate that the defendants have completed the kiting activity.[5] The intended loss analysis of *Watkins* is thus inapplicable to this case because the evidence in the record clearly demonstrates that the defendants did not merely attempt a check-kiting scheme, nor did they partially complete their scheme; rather, by writing checks far in excess of the amount available in their checking account, the defendants had, at the time of detection, caused the bank an actual loss of $1.1 million.

■ Nor does the fact that a check kiter makes restitution to the bank alter the fact of loss. As the Seventh Circuit recently explained, "[t]he fact that a check kiter enters into a repayment scheme after the loss

4. *See United States v. Shaffer*, 35 F.3d 110 (3d Cir.1994); *United States v. Frydenlund*, 990 F.2d 822 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 337, 126 L.Ed.2d 281 (1993); *United States v. Carey*, 895 F.2d 318 (7th Cir.1990); *United States v. Bolden*, 889 F.2d 1336 (4th Cir.1989). *See also United States v. Marker*, 871 F.Supp. 1404 (D. Kan.1994).

5. U.S.S.G. § 2X1.1 addresses "Attempt, Solicitation, or Conspiracy (Not Covered by a Specific Offense Guideline)." In *Watkins*, the sentencing court calculated the amount of loss based on the face value of the kited checks rather than on the amount of cash the defendant succeeded in drawing against the checks. *Watkins*, 994 F.2d

at 1193–94. We vacated *Watkins'* sentence because her intent was at issue regarding the amounts posted to her account upon deposit of the worthless checks, and she had not yet withdrawn those funds when the scheme was interrupted. *Id.* at 1196. In remanding, we explained that in order for intended loss to be deemed relevant for sentencing purposes in such situations, the defendant's conduct must meet the requirements of Guidelines § 2X1.1(b)(1) and the defendant must have (1) intended the loss; (2) been capable of causing the loss; and (3) completed or been about to complete but for interruption, all of the acts necessary to accomplish the loss. *Id.* at 1195–96.

has been discovered does not change the fact of the loss; such fact merely indicates some acceptance of responsibility." *United States v. Mau*, 45 F.3d 212, 216 (7th Cir.1995); *accord United States v. Carey*, 895 F.2d 318, 323 (7th Cir.1990) (holding that voluntary restitution following check kiting is properly considered for downward departure on the basis of acceptance of responsibility under the Guidelines and may not also be used to depart downward from a loss calculation); *United States v. Bolden*, 889 F.2d 1336, 1341 (4th Cir.1989) (holding that the fact that the defendant in a check-kiting scheme has made some restitution to the bank is no justification to adjust downward the minimum sentence of confinement specified by the Guidelines but may be relevant to the court in sentencing within the range). Permitting reductions in sentences because of restitution made some time after discovery of the check-kiting scheme might encourage, or at least reward, defendants who coerce or induce victim banks into settling for payment of only a portion of the amount lost. *See Mau*, 45 F.3d at 216–17; *Shaffer*, 35 F.3d at 115; *United States v. Marker*, 871 F.Supp. 1404, 1410 (D. Kan.1994).

■ Defendants in a check-kiting scheme are entitled to reduction of the loss by any funds actually available in the accounts on which the checks were drawn. *See United States v. Carman*, No. 93–6184, 1994 WL 236493 (6th Cir. June 1, 1994) (per curiam). In this case, at the time the check-kiting scheme was discovered, the bank's loss was $1.1 million. Shelby Bank was immediately able to setoff $84,000 from another account the defendants maintained there;[6] however, two years passed from the time the kite collapsed until the bank recovered all of its money. There is no evidence in the record to support the defendants' argument that the bank had security for its loss. Accordingly, the loss in this case is calculated as follows: the gross amount of the loss at the time of detection of the fraud ($1.1 million), less funds available for offset ($84,000) and secured collateral ($0), resulting in a net loss for sentencing purposes of $1,016,000. This calculation results in an increase of eleven points under § 2F1.1(b)(1) of the Guidelines, as was indicated in the presentence reports and as was adopted by the district court.

■ Finally, there is no basis for a downward departure in this case. The record shows that the district court clearly recognized that while the defendants' voluntary restitution was commendable, it did not change the fact that a crime had been perpetrated, that the bank had indeed suffered a loss, and that we do not operate under a system that unfairly rewards financially able defendants who voluntarily make restitution after they are caught. The defendants' restitution was considered for a downward departure of two points for acceptance of responsibility, which the district court approved, and they were sentenced at the low end of the Guidelines range. There is no support in the Guidelines or case law for giving double credit for restitution; thus, the district court did not err in sentencing these defendants.

### III.

For these reasons, the defendants' sentences are AFFIRMED.

---

**6.** The sentencing judge gave credit for that amount in calculating the loss. The Government does not contest that credit, and we find no error.