# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 98-1824

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United |
| | * | States District Court for |
| v. | * | the Eastern District of |
| | * | Missouri |
| | * | |
| Salim I. Akbani, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  June 9, 1998
Filed:  July 27, 1998

_____

Before WOLLMAN and MURPHY, Circuit Judges, and KYLE, District Judge.[1]


KYLE, District Judge.

    Salim I. Akbani pled guilty to one count of bank fraud, in violation of 18
U.S.C. §§ 1344(1) and 1344(2), for a check-kiting scheme he executed using two
separate checking accounts at different financial institutions.  He appeals from the

---

[1]    The Honorable Richard H. Kyle, United States District Judge for the
District of Minnesota, sitting by designation.

district court's[2] sentence, arguing that the district court improperly calculated the amount of the loss caused by his conduct, and that the district court erred in ordering him to pay restitution. For the reasons set forth below, we affirm the district court in all respects.

## Background

Akbani was the sole owner of two businesses, Sportswear, Inc. and Akbani Industries, Inc., both located in Puxico, Missouri. Sportswear, Inc. had a checking account, maintained by Akbani and on which he was an authorized signer, at the First National Bank of the Mid-South ("First National") in Sikeston, Missouri. He also maintained a checking account for Akbani Industries, Inc., on which he was an authorized signer, at the Bank of Advance in Advance, Missouri.

In late 1994, Akbani began to write checks on each account made payable to the other, knowing that neither account contained sufficient funds to support the payments. He would then deposit the checks into the accounts, in order to artificially inflate the balances and cause the respective banks to honor checks for which there were insufficient funds. Between December 28, 1994 and December 30, 1994, Akbani wrote three checks totaling $213,800, drawn on the Bank of Advance account for deposit into the account at First National. He also wrote checks from the account at First National for deposit into the account at the Bank of Advance. The checks that were drawn on the Akbani Industries, Inc. account at the Bank of Advance and deposited into Sportswear, Inc.'s account at First National were returned to First National as unpaid due to insufficient funds. This "charge-back" resulted in an overdraft to the Sportswear, Inc. account at First National of approximately $165,000.

---

[2] The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

After the overdraft on the Sportswear, Inc. account was discovered, First National received additional funds and applied them against the overdraft, reducing it to approximately $158,000. Subsequently, the bank began collection action on collateral that had been posted by Sportswear, Inc. for loans that it had taken out with the bank. Ultimately, First National sold the overdraft note at a discount to the Bank of Advance.

On June 12, 1997, Akbani was charged in a four-count indictment with bank fraud by check-kiting,[3] in violation of 18 U.S.C. §§ 1344(1) and 1344(2). On November 10, 1997, Akbani pled guilty to Count I of the indictment pursuant to a plea agreement. The parties were unable, in the plea agreement, to agree on the appropriate amount of loss for purposes of sentencing.

The presentence investigation report (PSI) determined the amount of loss to be $165,000. Applying section 2F1.1(b)(1)(H) of the United States Sentencing Guidelines, the PSI recommended a seven-point enhancement to the applicable offense level. After Akbani objected to the calculation of the amount of loss and the resulting enhancement, a supplemental addendum to the report was issued,

---

[3] Black's Law Dictionary defines "kiting" as:

> The wrongful practice of taking advantage of the float, the time that elapses between the deposit of a check in one bank and its collection at another. Method of drawing checks by which the drawer uses funds which are not his by drawing checks against deposits which have not yet cleared through the banks. "Kiting" consists of writing checks against a bank account where funds are insufficient to cover them, hoping that before they are presented the necessary funds will be deposited.

Black's Law Dictionary 871 (6th ed. 1990) (citation omitted).

explaining the method that had been used to calculate the amount of loss. The amount of loss was reached by using the amount of the overdraft in the account at the time the check-kiting scheme was discovered.

In order to resolve Akbani's objection, the district court held two evidentiary sentencing hearings. FBI Special Agent Scott Skinner ("Skinner"), testified that, as of December 30, 1994, both accounts had positive balances, and there were no floats outstanding as to either account. He also testified that the total amount of the overdraft was $165,000. The Government also introduced documentary evidence showing that First National had an overdraft of approximately $165,000 as of January 6, 1995. Clinton Vestal, the United States Probation Officer who had prepared the PSI, testified that, during his investigation, he had learned that three checks that Akbani had written as part of the check-kiting scheme on December 28, 29, and 30, 1994, were subsequently returned as unpaid. This resulted in an overdraft in the account at First National of approximately $165,000, which the bank discovered on January 6, 1995.

On March 13, 1998, the district court held another evidentiary sentencing hearing, at which William Sharp, an executive vice president of First National, testified that the amount of the overdraft in the account at the bank was approximately $165,000. Sharp also testified that, on December 30, 1994, both bank accounts in question had positive balances.

At the March 13, 1998 hearing, Sharp also testified about the expenses incurred by First National after the discovery of the check-kiting scheme. These expenses included a discount of approximately $4,800 on the sale of the overdraft note to the Bank of Advance, $3,018.65 of net expenses, and $7,002.85 in attorneys' fees. The total "loss" to which Sharp testified was $14,584.18.

At the conclusion of the March 13, 1998 hearing, the district court determined

4

that the amount of loss was $165,000, which resulted in a seven-point enhancement to the offense level.[4] The district court then departed downward[5] and sentenced Akbani to a term of imprisonment of six months, to be followed by six months of home confinement and three years of supervised release. The district court further ordered Akbani to pay restitution to First National, in the amount of $11,564.53. The remaining counts of the indictment against Akbani were dismissed.

## Analysis

### A.    Standard of Review

"We review findings of fact at the sentencing hearing for clear error and give due deference to the district court's application of the guidelines to the facts." United States v. Brelsford, 982 F.2d 269, 271 (8th Cir. 1992). At sentencing, the Government bears the burden of proving the amount of loss by a preponderance of the evidence. United States v. Wells, 127 F.3d 739, 746 (8th Cir. 1997). The determination of the amount of loss attributable to a defendant is a factual question which we review for clear error. See United States v. Earles, 955 F.2d 1175, 1180 (8th Cir. 1992). Where a district court has made a legal interpretation of terminology in the Sentencing Guidelines, however, and applied that interpretation to the facts, we review both the interpretation and the application de novo. See

---

[4] Section 2F1.1(b)(1)(H) of the United States Sentencing Guidelines provides that, if the amount of loss is between $120,000 and $200,000, the offense level shall be increased by seven points.

[5] The Sentencing Guidelines called for a term of imprisonment of between 12 and 18 months. The district court granted the downward departure pursuant to § 5K2.0, finding that the Sentencing Guidelines had not adequately taken into account "the circumstances and . . . all of the factors in this particular case" and that Akbani had "continued to strive to reduce the harm to the financial institutions involved." We are not called upon to review this departure.

United States v. Manuel, 912 F.2d 204, 206 (8th Cir. 1990) (quoting United States v. Toler, 901 F.2d 399, 402 (4th Cir. 1990)); see also Wells, 127 F.3d at 745-46.

## B.     Amount of Loss

Akbani argues that the amount of loss in a check-kiting scheme should be determined by the amount of the float at the time that the scheme is discovered.  He contends that, because both accounts in question had positive balances on December 30, 1994, the relevant amount of loss should be zero.  The Government responds that while the amount of loss is to be determined at the "time" of the discovery of the scheme, this does not mean that it must be determined as of the "day" of discovery, and that the full amount of loss could not be determined until all of the checks in the scheme had been presented for payment, thereby revealing the extent of the overdraft.

In United States v. Morris, 18 F.3d 562 (8th Cir. 1994), this Court considered the appropriate method for calculating the amount of loss in a check-kiting scheme.[6] The Morris court applied section 2F1.1 of the Guidelines, and recognized that, under that section, the offense level is determined by "either the actual loss resulting from the fraudulent conduct or the amount of loss the defendant intended to inflict, whichever is greater."  Morris, 18 F.3d at 570 (citing United States v. Edgar, 971 F.2d 89, 93 (8th Cir. 1992)); see also United States v. Prendergast, 979 F.2d 1289, 1292 (8th Cir. 1992) ("The focus for sentencing purposes under § 2F1.1 should be on the amount of possible loss the defendant attempted to inflict on the victim."), quoted in Morris, 18 F.3d at 570.  The Morris court reversed the district court's

_____

[6] Although Akbani contends that Morris did not "specifically address[] the measure of damages for a check-kiting offense," we find that, while it did not use the term "check-kiting," Morris did involve a check-kiting scheme and controls the instant case with regard to determination of the amount of loss.

6

determination of the amount of loss, holding that the district court had erroneously excluded from that determination the amount of five checks for which there were insufficient funds, but which the defendants had repaid prior to discovery of the check-kiting scheme. Recognizing that the amount of loss in a case involving a check-kiting scheme does not turn on "actual loss" or "net loss," the Morris court remanded for resentencing, and instructed the district court to include in its determination of the amount of loss the amount of the checks written by the defendants for which there were insufficient funds, but which had been repaid. Morris, 18 F.3d at 570 (citing Prendergast, 979 F.2d at 1291).

Even more instructive than Morris, however, is our decision in United States v. Wells, 127 F.3d 739 (8th Cir. 1997), and our discussion of Morris therein. In Wells, we explained the determination of the amount of loss in Morris and stated:

> Implicit in our decision [in Morris] was an understanding that the defendant, at the time he committed the fraud, had intended to succeed to the full amount of the check and to cause all the loss that could possibly be caused by the bad check. The fact that the defendant later paid some of the money back did not alter the amount of loss intended when the crime was committed. In that situation, the intended loss was properly measured by the possible loss, and did not hinge on actual or net loss.

Wells, 127 F.3d at 746. Akbani has shown, and we perceive, no reason why this rule should not govern the instant case.

The nature of a check-kiting scheme is that the balances of the accounts used are over-represented. At the exact moment of discovery of almost any such scheme, therefore, there will be no evident overdraft. The amount of loss becomes apparent only after the scheme begins to unravel, and the fraudulent checks cease to artificially support each other. It would make little sense, therefore, to fashion a rule

that requires a sentencing court to look only at the exact date on which the scheme is discovered. In the instant case, while the scheme may have been discovered on December 30, there was no way to determine the amount of the overdraft (and therefore, the amount of the loss) until the fraudulent checks were presented for payment and revealed to be unsupported by sufficient funds. If the Court were to adopt Akbani's proposed rule for determining the amount of loss in such a case, determinations of the amount of loss in check-kiting cases would become wholly arbitrary, dependent on when the bank or the Government happens to have discovered the scheme and whether the perpetrators of the scheme happen to have recently written fraudulent checks which have had their intended effect of artificially inflating the account balance but not yet been returned to the bank for insufficient funds. None of the cases from other jurisdictions cited by Akbani compels -- or even suggests -- such an unlikely result. See United States v. Flowers, 55 F.3d 218 (6th Cir. 1995); United States v. Shaffer, 35 F.3d 110 (3d Cir. 1994); United States v. Frydenlund, 990 F.2d 822 (5th Cir. 1993); United States v. Carey, 895 F.2d 318 (7th Cir. 1990); United States v. Bolden, 889 F.2d 1336 (4th Cir. 1989); United States v. Marker, 871 F. Supp. 1404 (D. Kan. 1994). These cases stand for the general proposition -- which the Government does not dispute -- that the amount of loss in check-kiting cases is to be determined when the scheme is discovered, rather than at the time of sentencing. None of them, however, suggests that the amount of loss must be determined as of the exact moment of discovery, at which point the balances of the bank accounts in question would still be artificially inflated by the very scheme for which the defendant is being sentenced.

We find, therefore, that the district court properly interpreted the guidelines and properly applied them to the facts of the instant case.

We further find that the Government presented sufficient evidence on which the district court could determine that the amount of loss was more than $120,000.

8

## C.    Restitution

Akbani contends that the district court erred in ordering him to pay $11,564.53 restitution to First National, because the amount of restitution was not pegged to the actual losses suffered by the bank, and because he and the bank had previously executed a reciprocal release.

"An order of restitution is reviewed under the clearly erroneous standard." United States v. Berndt, 86 F.3d 803, 809 (8th Cir. 1996).  District courts have wide discretion in ordering restitution.  Id. at 809 (citing United States v. Bartsh, 985 F.2d 930, 933 (8th Cir. 1993)).

We begin by rejecting Akbani's argument that restitution is improper because Akbani and First National had entered into a "Complete Reciprocal Release" on February 3, 1995, by which the bank released Akbani from any claims or damages arising out of their relationship.  Akbani failed to present any evidence of this agreement or even make reference to it during either of the evidentiary sentencing hearings, the second of which was held specifically for determining the appropriate amount of restitution.  In the absence of any such evidence, the district court did not clearly err in imposing restitution.

Moreover, we find that the district court did not clearly err in determining the amount of restitution.  The district court received evidence on three categories of loss suffered by First National as a result of Akbani's check-kiting scheme:    (1) a loss of approximately $4,800 on the bank's discounted sale of the note;     (2) net expenses of $3,018.65 incurred in securing Akbani's collateral; and       (3) attorneys' fees of $7,002.85.  On his cross-examination by Akbani's counsel, Sharp, First National's executive vice president, agreed that the expenses incurred in securing the collateral could be characterized as "a collateral consequence of the failure of [the bank's] relationship with Mr. Akbani."

The district court awarded restitution in the amount of $11,564.53, an amount to which Akbani did not object. The district court did not explain how it arrived at this figure, which was approximately $3,000 less than the amount that Sharp testified First National lost as a result of Akbani's conduct. With regard to the $3,018.65 in "net expenses," however, Sharp conceded that such expenses were not directly attributable to the check-kiting scheme but were, instead, "a collateral consequence." Had the district court simply added the two categories of loss directly attributable to the check-kiting scheme -- $4,800 and $7,002.85 -- it could have appropriately ordered restitution in the amount of $11,802.85, a greater amount than it actually ordered. While we encourage sentencing courts to make specific findings of fact in determining an appropriate amount of restitution, we have recognized that such findings are less important in situations, as here, where the defendant does not object at the sentencing hearing to the amount of restitution. See Berndt, 86 F.3d at 809 (citing Bartsh, 985 F.2d at 933).

Finally, Akbani argues that restitution cannot include consequential damages such as attorneys' fees. Akbani directs this Court to several cases from other jurisdictions which hold that, in cases that result in damage to or loss or destruction of property, attorneys' fees may not be included in calculation of the amount of restitution. We agree with the Government that the cases cited by Akbani are inapposite because the instant case does not involve damage to or loss or destruction of property. The language of the Victim and Witness Protection Act ("VWPA") that restricts restitution in such cases to the replacement value of the property, therefore, is inapplicable in the instant case. See 18 U.S.C. § 3663(b)(1). In cases involving offenses such as the instant one, the VWPA requires only that the restitution ordered by the district court be based on losses "caused by the specific conduct that is the basis for the offense of conviction." United States v. Marsh, 932 F.2d 710, 712 (8th Cir. 1991) (quoting Hughey v. United States, 495 U.S. 411, 413, 110 S. Ct. 1979, 1981 (1990)). We hold that there is no blanket prohibition in the VWPA against inclusion of attorneys' fees in the calculation of a

10

restitution amount for offenses that do not result in damage to or loss or destruction of property. Accordingly, we hold that the district court did not clearly err in determining that Akbani's conduct directly caused $11,564.53 in losses to First National, and we affirm the district court's order of restitution in that amount.

For the foregoing reasons, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS EIGHTH CIRCUIT.