UNITED STATES of America,
Plaintiff–Appellant,

v.

John W. RUTANA, Defendant–Appellee.

No. 93–3326.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 28, 1994.

Decided March 17, 1994.

Peter A. Appel (argued and briefed), U.S. Dept. of Justice, Environment & Natural Resources, Washington, DC, for plaintiff-appellant.

Charles E. Dunlap (argued and briefed), Youngstown, OH, for defendant-appellee.

Before: KENNEDY and GUY, Circuit Judges; and CONTIE, Senior Circuit Judge.

KENNEDY, Circuit Judge.

For the second time, the United States appeals the sentence of defendant John W. Rutana, who pled guilty to eighteen counts of knowingly discharging pollutants into a public sewer system in violation of the Federal Water Pollution Control Act, commonly known as the Clean Water Act, 33 U.S.C. §§ 1317(d), 1319(c)(2)(A). This Court vacated defendant's original sentence and remanded the case to the District Court for resentencing. *United States v. Rutana*, 932 F.2d 1155 (6th Cir.) ("*Rutana I*"), *cert. denied*, —— U.S. ——, 112 S.Ct. 300, 116 L.Ed.2d 243 (1991). The United States appeals defendant's second sentence on the grounds that the District Court erred in declining to increase defendant's offense level as provided under United States Sentencing

Guidelines ("U.S.S.G." or the "Guidelines") § 2Q1.2(b)(3) for the disruption of a public utility. For the reasons that follow, we again vacate defendant's sentence and remand the case to the District Court for resentencing.

## I.

The full background of this case is set forth in *Rutana I*. We include here only the facts relevant to the issue raised in the instant appeal. Defendant was part owner and chief executive officer of Finishing Corporation of America ("FCA"), a now-bankrupt corporation. In 1985, FCA opened a plant in Campbell, Ohio that anodized aluminum. This process produced large quantities of highly acidic and highly alkaline wastewater. FCA discharged these hazardous pollutants into a city sewer line that led directly to the Campbell Waste Water Treatment Plant ("CWWTP"). The CWWTP discharges its effluent into the Mahoning River, which supplies drinking water to some downstream communities.

In January, February, March and April of 1987, four major bacteria kills occurred at the treatment plant. The CWWTP uses bacteria to treat waste before it discharges its effluent. The bacteria kills were attributed to FCA's discharges. FCA was notified after each kill of its involvement in the kills, but the company continued its discharges despite these warnings. A Federal Environmental Protection Agency ("EPA") investigation uncovered the fact that FCA had failed to obtain any permit that would allow any discharges, let alone discharges of the materials involved here.

On April 9, 1988, a CWWTP employee was burned while attempting to sample FCA's discharges. On May 15, 1988, the Ohio EPA sent a letter to the City of Campbell telling them that the treatment plant had violated its clean water permit. The City sent a copy of this letter to FCA. In July, 1988, after an investigation by the FBI, defendant agreed to voluntarily close the plant. However, FCA's discharges continued through 1988 and the treatment plant experienced additional bacteria kills. A second CWWTP employee was burned on December 16, 1988 while sampling a discharge from FCA.

Defendant was subsequently indicted for the following crimes: eighteen counts of knowingly discharging pollutants into a public sewer system, and thereby into the CWWTP in violation of national pretreatment standards, in violation of 33 U.S.C. §§ 1317(d) and 1319(c)(2)(A); two counts of knowingly placing people in imminent danger of death or serious bodily injury, in violation of 33 U.S.C. §§ 1317(d) and 1319(c)(3); and two counts of making a false statement in violation of 18 U.S.C. § 1001. Defendant pled guilty to the first eighteen counts of the indictment and the remaining counts were dismissed.

### A. The First Sentence

In the first sentencing proceeding, the presentence report ("PSR1") calculated defendant's offense level of eighteen (18) as follows:

(1) Base offense level of eight (8) for mishandling of hazardous or toxic substances, under U.S.S.G. § 2Q1.2(a).

(2) Increase [of] six (6) levels[ ] for repetitive discharge, under U.S.S.G. § 2Q1.2(b)(1)(A).

(3) Increase [of] four (4) levels[ ] for disruption of a public utility, under U.S.S.G. § 2Q1.2(b)(3).

(4) Increase [of] two (2) levels[ ] for playing a leadership role in the activity, under U.S.S.G. § 3B1.1(c).

(5) Decrease [of] two (2) levels[ ] for acceptance of responsibility, under U.S.S.G. § 3E1.1(a).

*Rutana I*, 932 F.2d at 1157. While the court accepted the facts and findings of PSR1, it nevertheless departed downward from level 18 to level 6, and sentenced defendant to five years of probation, combined with 1,000 hours of community service. The court also imposed a $90,000 fine, which represented $5,000 per violation, and a special assessment of $950. *Id.* at 1158.

On appeal, this Court reversed the sentence because we found that the District Court had used improper bases to grant a downward departure. *Id.* at 1158–59. In granting the departure, the District Court

had relied upon defendant's ownership of another company, which might fail if defendant were incarcerated, which in turn would cause the loss of jobs; and upon its belief that the minimum fine, which it believed to be mandatory, was too harsh. *Id.* The case was remanded for resentencing.

### B. The Second Sentence

Upon remand, a different district judge ordered the preparation of a second presentence report ("PSR2"). PSR2 recommended an offense level of 17; the calculations were identical to PSR1, except that PSR2 recommended a three-point reduction for acceptance of responsibility, provided for in a 1992 amendment to the Guidelines, which had not been available at the time PSR1 was prepared. Defendant objected to the increases for his role in the offense and requested an additional two-level reduction under the disruption-of-a-public-utility guideline, U.S.S.G. § 2Q1.2(b)(3), comment. (n. 7).

The District Court did not accept the calculations in PSR2 and did not increase the offense level for disruption of a public utility, U.S.S.G. § 2Q1.2(b)(3). The court sentenced defendant to four months of home confinement without an electronic monitoring device, three years of probation and imposed a fine of $30,000.

### II.

■ The United States raises just one issue on appeal: whether the District Court erred when it refused to increase defendant's offense level for disruption of a public utility under U.S.S.G. § 2Q1.2(b)(3). This section provides:

> If the offense resulted in disruption of public utilities or evacuation of a community, or if cleanup required a substantial expenditure, increase by 4 levels.

There is nothing in the Guidelines themselves or in the commentary thereto that discusses what the phrase "disruption of public utilities" encompasses. There is scant case law on this question. In *United States v. Wells Metal Finishing, Inc.*, 922 F.2d 54 (1st Cir.1991), the First Circuit discussed the applicability of section 2Q1.2(b)(3) under cir-

cumstances very similar to the facts of this case. In *Wells*, the defendant discharged wastewater containing zinc and cyanide into the city sewer system. The defendant's discharges caused bacteria kills at the city's sewage treatment plant, which meant that waste was inadequately treated before it was discharged into a river, which served as a drinking water source. There was evidence that the city spent $1,000 to $10,000 per month over and above normal expenses to compensate for the defendant's discharges and resulting bacteria kills. The *Wells* court considered this evidence and affirmed the lower court's holding that the defendant's activities disrupted a public utility. *Id.* at 57–58.

In the present case, defense counsel agreed with the United States that defendant's activities caused a disruption of a public utility: "What I would state to the Court is that the disruption, if there was any, and I agree with Mr. Sasse [government counsel] in his representation to the Court, that the disruption that took place was the killing of bacterias [sic]." The court drew a distinction between a disruption and an impact and found that defendant's activities had impacted a public utility but had not disrupted it and declined to apply the increase. It believed that to do so would be an overly technical interpretation and application of the Guidelines.

■ When reviewing the District Court's application of the Guidelines, we review its factual findings for clear error and its legal conclusions *de novo*. *United States v. Watkins*, 994 F.2d 1192, 1195 (6th Cir. 1993). We believe that the District Court's distinction between "disruption" and "impact" was correct; a disruption is something more than a simple interference or interruption. Webster's defines "disrupt" as follows: "1a: to break apart: RUPTURE ... [;] b: to throw into disorder or turmoil ... [;] c: to destroy the unity or wholeness of ... [;] 2: to interrupt to the extent of stopping, preventing normal continuance, or destroying[.]" *Webster's Third New International Dictionary* 656 (3d ed. 1971). We find, however, that what occurred in this case was a disruption of public utility. The undisputed evi-

dence shows that defendant's discharges caused several bacteria kills at the CWWTP and burned two CWWTP employees. Most importantly, defendant's discharges caused the CWWTP to violate its clean water permit. Because of defendant's actions, the CWWTP was unable to meet its permit requirements and was for this reason unable to perform its essential function. We do not believe that the expenditure of substantial sums of money is required to prove that a disruption of a public utility has occurred. A contrary conclusion would arguably be at odds with section 2Q1.2(b)(3) itself, which is written in the disjunctive and applies when a disruption of a public utility has occurred *or* where cleanup has required a substantial expenditure. We hold that the District Court erred in failing to apply section 2Q1.2(b)(3).

## III.

The District Court's judgment is vacated and the case is remanded to the District Court with instructions to apply U.S.S.G. § 2Q1.2(b)(3).