**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Thomas C. SCOTT, Defendant–Appellant.**

No. 95–5661.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 17, 1995.

Decided Jan. 19, 1996.

---

Carroll L. Andre, III, Asst. U.S. Atty. (argued and briefed), Office of the U.S. Atty., Memphis, TN, for U.S.

Leslie I. Ballin (argued and briefed), Ballin & Ballin, Memphis, TN, for Thomas C. Scott.

Before: MARTIN and JONES, Circuit Judges; COHN, District Judge.*

COHN, District Judge.

This is a sentencing appeal. Following defendant-appellant Thomas Scott's (Scott) plea of guilty to one count of bank fraud, 18 U.S.C. § 1344, the district court sentenced Scott to a term of 12 months and one day imprisonment followed by a three year period of supervised release, and directed restitution in the amount of $74,547.00. Scott contends that the district court inflated the victim bank's "loss" figure for purposes of determining restitution and calculating his score under the United States Sentencing Guidelines (USSG). Scott also challenges the district court's failure to depart downward from the appropriate guideline range under § 5K2.0 for substantial assistance and extraordinary acceptance of responsibility. For the reasons that follow, Scott's sentence will be affirmed in part and reversed in part.

I.

A.

Scott was employed as a senior vice-president in charge of leasing at United American Bank (UAB). Scott created a fictitious company called Office Design Group (ODG) and forged false documents reflecting UAB's purchase of office equipment from ODG and its placement with various fictitious lessees. In his role as Senior Vice–President, Scott approved the transactions and caused cashier's checks to be issued payable to ODG. Scott deposited the checks into a checking account he had opened in a name other than his own and then used the money for personal expenses. Scott created later purchase transactions to cover lease payments as they came due.

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

Scott was charged with one count of bank fraud. At the time the information was filed, although one of the fictitious lease accounts showed a gain due to interest in the amount of $1,709, a total of $75,546.22 was outstanding on the fictitious accounts. With counsel present, Scott immediately met with UAB officials. His employment was terminated. Scott informed the UAB officials that he was in the process of negotiating a $2.6 million lease transaction for UAB with Bell Atlantic. If completed, UAB stood to make approximately $250,000 in fees, and Scott would have been entitled to a commission of $64,712.40 which UAB could then keep to offset losses from the fraudulent lease transactions. UAB asked Scott to continue working on the Bell Atlantic lease to fruition. Within 30 days, Scott closed the deal. Skip Lynch, Vice–President of Bell Atlantic TriCon Leasing, later wrote Scott to express his disappointment at Scott's "decision to leave" UAB. The letter stated that the decision casted doubt on the future of Bell Atlantic's relationship with UAB given that Lynch "personally could not have authorized a two million dollar lease portfolio without the comfort level of having Tom Scott involved."

Counsel for Scott wrote to UAB indicating that within one week Scott would be able to pay the bank $7,500—the approximate amount he owed to the bank after subtracting the commission to which he would have been entitled for the Bell Atlantic deal from UAB's loss of $75,546.22. UAB responded that it considered its loss to be $75,546.22 and that any commissions Scott earned were pursuant to his employment at the bank and did not constitute an offset.

### B.

Scott entered into a plea agreement with the government. Although it was not required by the plea agreement, Scott voluntarily gave the Federal Bureau of Investigation any information that he could. This amounted to background information which did not lead to a prosecution.

At sentencing, Scott argued that the "intended loss" to UAB from his fraudulent activities was zero because he intended to eventually pay-off the fictitious lease ac-

counts, as indicated by his payment in full of one of the accounts which resulted in a $1,709 gain to UAB. Scott argued that the "actual loss" suffered by UAB should have been reduced by UAB's retention of the $64,712.40 commission and that this was relevant for purposes of both the sentencing guideline calculation and restitution. While he agreed that his cooperation did not warrant a USSG § 5K1.1 motion by the government, Scott argued that he should be entitled to a § 5K2.0 downward departure because he had voluntarily revealed information about the offense and other activities at UAB to the government and because his intent to pay-off the accounts during the offense and to provide virtually full restitution after the offense made the sentence unduly harsh.

The presentence report indicated an actual loss of $74,546.22. The district judge accepted this amount for sentencing purposes and restitution, stating:

> [t]he situation with the opportunity for restitution, I mean that's just a situation where initially the bank made a decision that it would allow some other compensation that he was going to receive had his employment continued to be in effect and offset against the loss. That's the way the bank initially decided to treat it. They didn't have to treat it that way, and they ultimately decided not to, and I don't think that whole circumstance really affects in any way the loss. I think the bank had actual loss in the approximate amount of $75,000.00 as of the day the crime was discovered, and I don't think that whole circumstance either affects the amount of the loss or affects the amount of restitution that's owed.

The district court declined to depart downward for extraordinary efforts at restitution or cooperation with the government. Pursuant to USSG § 2F1.1(b)(1)(G), the district court added six levels to the base offense level of six under USSG § 2F1.1(a) for a loss over $70,000. The district court added two levels because the offense involved more than minimal planning, and two additional levels due to Scott's position of trust. The district court adjusted downward three levels due to Scott's acceptance of responsibility pursuant

to USSG § 3E1.1.3. This resulted in a guideline sentence range of 12 to 18 months. The district court sentenced Scott to 12 months and one day imprisonment, a three year period of supervised release, and restitution in the amount of $74,547.00, with $24,547 payable to UAB's insurer, Reliance Insurance Company, and $50,000 to UAB under its deductible.[1]

## II.

On appeal, Scott first argues that the district court erred by requiring him to pay $74,547 in restitution given that UAB offset its loss by keeping the commission due him. Second, Scott argues that the commission retained by UAB should have been deducted from the amount of loss used in determining the sentencing guideline range. He contends that the "actual loss" to UAB was only $9,834.60 in that he returned $64,712.40 to UAB by way of the earned commission within 30 days after being charged. In this regard, Scott contends that the offense is similar to a fraudulent loan transaction where any collateral secured by the creditor offsets the loss amount. Scott relies on *United States v. Moored,* 38 F.3d 1419, 1427 (6th Cir.1994), a fraudulent loan case. Third, Scott argues that his sentence should have been reduced pursuant to USSG § 5K2.0 because he fully cooperated with the government before even entering into the plea agreement and made extraordinary efforts toward restitution for which the guidelines do not adequately account.

## III.

### A.

■ Under the Victim and Witness Protection Act (VWPA), 18 U.S.C. §§ 3663–3664, a court may order that a defendant provide restitution to a victim in compensation for the victim's loss. In determining whether to order restitution and in what amount, a court considers: "the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. § 3664(a). A district court's discretion in fashioning restitution is not unlimited. Amounts a victim receives that reduce the loss are not to be included in the restitution amount:

> *"The court shall not impose restitution with respect to a loss for which the victim has received or is to receive compensation,* except that the court may, in the interest of justice, order restitution to any person who has compensated the victim for such loss to the extent that such person paid the compensation."

18 U.S.C. § 3663(e)(1) (emphasis added). The proper inquiry is whether a payment results in the victim receiving compensation for the loss. *See United States v. Oren,* 893 F.2d 1057, 1066 (9th Cir.1990) ("[T]he crucial inquiry is whether, if accepted, the gift would result in [the victim's] having received compensation for its loss"). "Any dispute as to the proper amount of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664. The amount of restitution is reviewed for abuse of discretion while the authority to order restitution is subject to *de novo* review. *United States v. Lively,* 20 F.3d 193, 200 (6th Cir. 1994).

■ Here, the restitution ordered by the district court was improper because it imposed restitution "with respect to a loss for which the victim has received ... compensation." There is no other way to characterize UAB's retention of the Bell Atlantic commission except as acceptance of partial compensation for the loss. At the time Scott revealed his fraudulent activities to UAB, Bell Atlantic was merely a prospective customer. As evidenced by Lynch's letter, it is Scott's involvement that brought the Bell Atlantic deal to fruition and no one disputes that, had he still been employed, he would have received the commission. Whether or not Scott continued working on the deal at UAB's behest, it was UAB's decision to re-

---

1. The amount payable to Reliance Insurance Company represents its loss after deducting the $50,000 deductible paid by UAB.

tain Scott's commission after he closed the deal and to therefore accept this compensation for its loss. *See Oren, supra* at 1066. That the commission is something of an unorthodox method of payment is irrelevant. *See United States v. Guthrie*, 64 F.3d 1510 (10th Cir.1995) (district court erred in not reducing amount of restitution by "the value of services [defendant] performed" because under 18 U.S.C. § 3663(e)(1) "determination of loss must account for any benefit received by the victim"); *Oren, supra* (where defendant made a "gift" of land to victim, district court erred in not ordering that victim's decision to accept "gift" would compensate victim for loss and reduce amount of restitution by that amount).

The restitution ordered by the district court therefore amounts to a requirement that Scott compensate UAB for more than it ultimately lost in violation of 18 U.S.C. § 3663(e)(1). On remand, the district court will have to determine, by a preponderance of the evidence, the commission Scott would have earned. 18 U.S.C. § 3664.

### B.

█ The district court properly refused to deduct the commission from the loss amount used in calculating Scott's sentencing guideline score. In reviewing the district court's application of the sentencing guidelines, factual findings of the district court are subject to the "clearly erroneous" standard of review, while legal conclusions are reviewed *de novo*. 18 U.S.C. § 3742(e); *United States v. Rutana*, 18 F.3d 363, 365 (6th Cir.1994) (citing *United States v. Watkins*, 994 F.2d 1192, 1195 (6th Cir.1993)).

USSG § 2F1.1 assigns a base offense level of six and then increases the offense level for different loss amounts beginning with $2,000. It states:

§ 2F1.1 *Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States*

(a) Base Offense Level: 6

(b) Specific Offense Characteristics

(1) If the loss exceeded $2,000, increase the offense level as follows:

| Loss (Apply the Greatest) | Increase in Level |
|---|---|
| * * * | |
| (C) More than $5,000 | add 2 |
| (D) More than $10,000 | add 3 |
| * * * | |
| (G) More than $70,000 | add 6 |

Application Note 7 in the Commentary to § 2F1.1 states:

Valuation of loss is discussed in the Commentary to § 2B1.1 ... As in theft cases, loss is the value of the money, property, or other value of the services unlawfully taken ...

Subsection (b) of Application Note 7 states that in fraudulent loan application and contract procurement cases, the actual loss is offset by any collateral pledged to secure the loan or any amount the lending institution has recovered or can expect to recover.[2]

Here, there is no dispute that the outstanding balance on the fraudulent leases when the offense was discovered was $74,547. Scott argues, however, that the offense is similar to a fraudulent loan transaction because the commission which UAB retained was the equivalent of secured collateral to offset its loss. Scott contends that, as in a fraudulent lease transaction, UAB's actual loss for sentencing purposes should be offset by the collateral.[3]

█ In *United States v. Flowers*, 55 F.3d 218 (6th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 261, 133 L.Ed.2d 185 (1995), we joined four other circuits in deciding that

---

**2.** "In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) or from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used."

**3.** Under USSG § 2F1.1(b)(1)(C), a $9,834.60 loss results in an increase of two offense levels rather than six.

"the relevant point in time for determining the amount of loss in a fraud case is at the time the crime was detected, rather than at sentencing." *Id.* at 221 (citing *United States v. Shaffer*, 35 F.3d 110, 114 (3d Cir.1994); *United States v. Frydenlund*, 990 F.2d 822, 826 (5th Cir.1993); *United States v. Carey*, 895 F.2d 318, 323 (7th Cir.1990); *United States v. Bolden*, 889 F.2d 1336, 1341 (4th Cir.1989)). In *Flowers*, we were faced with the same argument as is raised by Scott, but in the context of a check-kiting offense. We held that check-kiting is more akin to theft than to fraudulently obtaining a loan in that "[t]he offender in a fraudulently induced loan transaction at least asked the bank to provide the funds and gave some kind of security in return." *Id.* at 221. "The fact that a check-kiter enters into a repayment scheme after the loss has been discovered does not change the fact of the loss; such fact merely indicates some acceptance of responsibility." *United States v. Mau*, 45 F.3d 212, 216 (7th Cir.1995).

■ The fraudulent lease transactions here, like check-kiting, are distinct from fraudulent loan transactions in that the victim of the fraud was not given collateral to secure the fraudulently obtained funds. Scott's commission was not the equivalent of collateral because it was earned and offered *after* the offense was detected. Subsequently making voluntary restitution is simply not the equivalent of posting collateral. Because the commission was earned after Scott was caught, it is not an appropriate offset to the actual amount of loss and the district court properly calculated the loss for sentencing purposes at $74,546.22.

### C.

■ USSG § 5K2.0 states in part:

Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

Unless the decision involves an incorrect application of the sentencing guidelines or is otherwise in violation of the law, a district court's discretionary refusal to depart downward is not appealable. *United States v. Draper*, 888 F.2d 1100, 1105 (6th Cir.1989). If it cannot be determined whether the sentencing court exercised its discretion or wrongly believed it could not depart, the case will be remanded. *United States v. Bureau*, 52 F.3d 584 (6th Cir.1995).

Here, the district judge's statements indicate that she was aware of her discretion under § 5K2.0 to depart downward if the sentencing guidelines did not adequately account for the circumstances of Scott's offense, and using that discretion decided not to depart downward. The district court stated:

I would like to be able to take the factors I have mentioned into account more completely in fashioning an appropriate sentence, *but I do not think that there's anything in the fact situation that warrants a downward departure.*

Because "the district court was not unaware of its discretion to depart from the guideline range, and the sentence was not imposed in violation of law or as a result of an incorrect application of the guidelines, the failure to depart is not cognizable on appeal under 18 U.S.C. § 3742(a)." *United States v. Davis*, 919 F.2d 1181, 1187 (6th Cir.1990).

■ In any event, there is no basis for a downward departure. There was nothing unusual about Scott's cooperation with the government to mandate a departure. In *United States v. Lieberman*, 971 F.2d 989 (3d Cir.1992), deferring to the district court's discretion, the Third Circuit upheld a district court's decision to downwardly depart where the defendant immediately admitted to embezzlement when confronted by bank authorities, explained to the bank how he was able to avoid detection, resigned his position and provided restitution in a greater amount than that which he was formally charged. While this cooperation is similar to that provided by Scott in providing details as to how he was able to carry out the offense, the Third Circuit in *Lieberman* was reviewing a decision

to downwardly depart and deferred to the district court's discretion. *United States v. DeMonte*, 25 F.3d 343 (6th Cir.1994) also concerns review of a district court's decision to downwardly depart. *DeMonte* is further distinguishable in that there the defendant admitted committing a theft of which the government was completely unaware a year and a half prior to the relevant conduct. *Id.* at 349.

### IV.

For the reasons stated, Scott's sentence is AFFIRMED in part and REVERSED in part. The case is REMANDED to the district court for recomputation of the amount of restitution.