UNITED STATES of America, Plaintiff,

v.

Lisa GORT–DiDONATO, Defendant.

No. 1:95–CR–144.

United States District Court,
W.D. Michigan,
Southern Division.

June 19, 1997.

Julie Ann Woods, Asst. U.S. Attorney, Michael H. Dettmer, U.S. Attorney, Grand Rapids, MI, for U.S.

## OPINION

ENSLEN, Chief Judge.

This matter is on remand for re-sentencing on Wednesday, June 18 at 2:30 p.m. The Sixth Circuit Court of Appeals caused re-sentencing by its Opinion of March 27, 1997 (which is reported at 109 F.3d 318).[1]

Prior to appeal, the defendant at sentencing received a total offense level score of 14 and a criminal history category of II under the United States Sentencing Commission Guidelines Manual, which yielded a sentencing range of 18 to 24 months. The Court followed the probation office's recommendation and sentenced the defendant to 18 months imprisonment by its sentence of April 29, 1996. In doing so, the Court overruled three objections of the defendant to the pre-sentence report. One of these objections—relating to a two-point enhancement under Guideline Section 3B1.1(c)—is the basis for the Court of Appeals' Opinion vacating the sentence.

This case provides the Court an opportunity to comment on the judicial process and, unfortunately, to decry that a correct legal decision may, nevertheless, be reversed when it is badly argued by the Government and the Court of Appeals is focused more on calling attention to its own decisions than deciding cases in accordance with the clearly erroneous standard. The standard applicable to appeals of factual decisions in sentencing is clearly erroneous. *United States v. Rutana*, 18 F.3d 363, 365 (6th Cir.1994). The Sixth Circuit has said that a decision is "clearly erroneous" even though there is evidence to support the decision if the Court of Appeals is left with a definite and firm conviction that a mistake has been made. *Gort–DiDonato*, 109 F.3d

Michael J. Dunn, Grand Rapids, MI, for Defendant.

1. In hopes of promoting professional courtesy, I also note parenthetically that the Sixth Circuit's Opinion utilized unnecessarily the proofreading mark "[sic]." It is the best modern practice to simply correct misspelled words rather than mark them since the latter practice serves only to embarrass the writer—in this case, the *court reporter* who prepared the transcript of the sentencing. The use of the term was particularly inappropriate in this context since it referred to the court reporter's inaccurate spacing of the defendant's last name. However, the court reporter, who drew his spelling from the defendant's spelling in open court, could not determine the spacing from that spelling. In such a context, the use of the mark is simply rude.

at 320. What the Court of Appeals meant by this standard of review, in this case, is difficult to fathom since the law and the facts strongly support the two-point adjustment. Perhaps what was intended was that this Court failed because it failed to separately comment on each of the application notes. If this was the Court of Appeals' meaning, it has further burdened, unnecessarily, the work of the district courts in sentencing. More to the point, it has also departed markedly from the commonly understood meaning of "clearly erroneous." This term usually implies that the facts of a case indubitably do not support a legal finding (in this case, the finding that the defendant should receive a two-point adjustment under the section). As stated by the Seventh Circuit Court of Appeals,

> [U]nder the clearly erroneous standard, we cannot meddle with a prior decision of this or a lower court simply because we have doubts about its wisdom or think we would have reached a different result. To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must, as one member of this court recently stated during oral argument, strike us as wrong with the force of a five-week-old, unrefrigerated dead fish
> . . . .
> ... the panel's decision must be dead wrong, and we do not believe it is.

*Parts and Elec. Motors, Inc. v. Sterling Elec. Inc..* 866 F.2d 228, 233 (7th Cir.1988). The understanding of "clear error" expressed in the *Electric Motors* case has been adopted and applied by multiple panels of the Sixth Circuit Court of Appeals in cases involving criminal sentencing. *See, e.g., United States v. Perry,* 908 F.2d 56, 58 (6th Cir.1990); *United States v. Phibbs,* 999 F.2d 1053, 1075 (6th Cir.1993). One is left to ponder, however, why it was not applied in this case.

These concerns about the standard of review are far from academic. This Court must re-sentence a defendant on the same facts as previously determined and on law which was self-evident at the time of the former sentencing. The result, therefore, must be predictably the same. As John Adams said, in his famous defense of British Soldiers involved in the Boston Massacre,

> Facts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence.

Hugh P. Williamson, *John Adams Counselor of Courage,* 54 A.B.A. Journal 148, 150 (1968). Likewise, because we are a nation of written laws which give fair warning to our citizens of their legal responsibilities and entitlements, we cannot change the law because of whim or personal prejudice. As Adams again noted in this famous trial,

> The law, in all vicissitudes of government, fluctuations of the passions, or flights of enthusiasm, will preserve a steady undeviating course; it will not bend to the uncertain wishes, imaginations and wanton tempers of men. . . . It does not enjoin that which pleases a weak, frail man, but without regard to person, commands that which is good and punishes evil in all, whether rich or poor, high or low—'tis deaf, inexorable, inflexible. On the one hand it is inexorable to the cries and lamentations of the prisoners; or the other hand it is deaf, deaf as an adder, to the clamors of the populace.

*Id.* at 150. Since the law and facts pertinent to this matter have not changed, then neither can the sentence. This is troubling because it is a waste of judicial resources; but more than that, because it causes a traumatic, painful and frightfully unnecessary experience for the defendant—who instead of enduring further judicial proceedings should now be focusing on her own mental health and rehabilitation.

While the Court of Appeals did not apply the correct standard of review, its insight was not helped by the Government's arguments on appeal which unnecessarily focused on the defendant's control of the criminal scheme rather than the defendant's control of other co-conspirators. The Court of Appeals has correctly noted that this analysis is outdated in light of the addition of application note 2. As noted, application note 2 to Guideline Section 3B1.1 was added effective November 1, 1993. It made clear that to qualify for an adjustment under the section a defendant "must have been the organizer, leader, manager, or supervisor of one or

more participants of the conspiracy." A "participant" is defined in application note 1 as "a person who is criminally responsible for the commission of the offense." This application note, though, is peculiar because while limiting in one sense enhancements for controlling activities of nonparticipants, it allows "an upward departure" "in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization."

■ In this case, the two-point enhancement was previously and is now correctly applied in that the defendant "managed and supervised" the activities of co-conspirators Richard Gaffney and Diane Blair. The report indicates correctly that Gaffney and Gort–DiDonato both planned and executed this conspiracy to steal money from Gort–DiDonato's parents. While each blames the other for the crime, it is evident that they participated in a scheme that they both planned. Thus, it becomes evident that Gaffney and Gort–DiDonato both controlled the activities of one another in coordinating the thefts from Gort–DiDonato's parents and the wire transfers to secrete the assets—which, since they were both participants of the conspiracy, makes them each liable for the two-point enhancement. *See* application note 4 (stating that "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."). In particular, Gort–DiDonato controlled the activities of Gaffney and Diane Blair by executing the wire transfers from Western Michigan to Philadelphia so as to require them to pick up the wire transfers in order to secrete the money. Thus, the facts of this case support the application of the two-point enhancement. However, even if the Court were unable to find control over a participant, then the general control over this conspiracy and nonparticipants nevertheless strongly supports a two-point upward departure under application note 2. Namely, Gort–DiDonato decided for herself that the victims of this wire fraud would be her close relatives; she used her special influence over them to obtain the money to be spent on drugs, lavish trips and leisure; and she personally controlled the stolen funds and wired them through Western Union. Thus, her conduct is such that even if she did not warrant the two-point enhancement, she warrants a two-point departure under application note 2. Accordingly, this leaves the Court as before with a total offense level of 14, a criminal history category of II and a guideline range of 18 to 24 months.

■ While the sentence previously pronounced was correct in terms of the guideline score, the Court must also now consider the defendant as she stands before the Court. The Court sees an individual who has made progress in obtaining an education and clerical skills while in prison and who has arranged for employment following her incarceration. She has even worked a large degree of reconciliation with her parents—the victims of her crime (who now wish a lenient sentence). She has also begun payment of restitution, mental health counseling and treatment of alcohol abuse. Together, the Court finds that these circumstances are such that her case is outside the heartland of cases considered by the Court and that a two-point downward departure is appropriate under Guideline Section 5K2.0 and 18 U.S.C. § 3553(b). Accordingly, the Court determines that the appropriate, new offense level is 12 and that the defendant should be sentenced to time served so as to begin her return to society today.